**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO. 9:26-cv-80119-RKA**

ANTHONY SIRIANI *et al.*,

      Plaintiffs,

v.

DAVID FEINGOLD *et al.*,

      Defendants,

and

L3 CAPITAL INCOME FUND, LLC *et al.*,

      Nominal Defendants.

**L3 FUNDS' AND CARDINALE DEFENDANTS' MOTION TO DISMISS**

ACTIVE 723864604v3

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................1

BACKGROUND ....................................................................................................................2

    I.      Introduction to the L3 Funds...........................................................................2
    II.     Feingold's Conspiracy to Defraud the L3 Funds, the Investors, and
           Cardinale. .................................................................................................3

          A.      The Income Fund ...............................................................................3
          B.      The Hotel Fund ..................................................................................4
          C.      The SO Fund.......................................................................................4
          D.      Feingold and Broadstreet Hijack the L3 Funds' Investments. .....................5

    III.    Nature of the Allegations Against the Cardinale Defendants .................................6

MEMORANDUM OF LAW ...................................................................................................7

    I.      Plaintiffs Lack Derivative Standing to Proceed on Claims Belonging to the
           L3 Funds. .................................................................................................7
    II.     Plaintiffs Otherwise Fail to State a Cause on Action Against Movants..................8

          A.      Count I (Conversion) ........................................................................9
          B.      Count III (Securities Fraud)..............................................................10
          C.      Count IV (FDUTPA)........................................................................12
          D.      Count V (Fraud) ...............................................................................14
          E.      Count VII (Negligence) ...................................................................15
          F.      Count VIII (Civil Conspiracy) .........................................................15
          G.      Count IX (Unjust Enrichment).........................................................16
          H.      Count XIII (Judicial Dissolution) .....................................................17

## TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Altimas v. Whitney*,
   No. 2:09-cv-682, 2010 WL 11507317 (M.D. Fla. Dec. 9, 2010) ............................................16

*Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*,
   568 U.S. 455 (2013).................................................................................................................12

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009).................................................................................................................8, 9

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007).................................................................................................................8, 9

*Broadstreet Global Management, LLC v. Cardinale et al.*,
   No. 1:25-cv-20031-RKA, ECF Nos. 85 & 89 (S.D. Fla.)..........................................................8

*Bruschi v. Brown*,
   876 F.2d 1526 (11th Cir.1989) ...............................................................................................11

*Bryant v. Avado Brands, Inc.*,
   187 F.3d 1271 (11th Cir. 1999) ..............................................................................................12

*Cardenas v. Toyota Motor Corp.*,
   418 F. Supp. 3d 1090 (S.D. Fla. 2019) .....................................................................................9

*Carvelli v. Ocwen Fin. Corp.*,
   934 F.3d 1307 (11th Cir. 2019) ........................................................................................11, 12

*Day v. Taylor*,
   400 F.3d 1272 (11th Cir. 2005) ................................................................................................9

*Double AA Int'l Inv. Grp. v. Swire Pac. Hldgs.*,
   674 F. Supp. 2d 1344 (S.D. Fla. 2009) ...............................................................................13, 14

*F&F Invs. Grp. v. Case (In re Case)*,
   636 B.R. 852 (Bankr. S.D. Fla. 2022)........................................................................................9

*FindWhat Inv. Grp. v. FindWhat.com*,
   658 F.3d 1282 (11th Cir. 2011) ........................................................................................11, 12

*Five for Ent. S.A. v. Rodriguez*,
   877 F. Supp. 2d 1321 (S.D. Fla. 2012) ...................................................................................12

*In re FTX Cryptocurrency Exchange Collapse Litig.*,
   781 F. Supp. 3d 1324 (S.D. Fla. 2025) ...................................................................................14

*Garret-Alfred v. Facebook, Inc.*,
   540 F. Supp. 3d 1129 (M.D. Fla. 2021).............................................................................12, 13

*Hill v. Hoover Co.*,
   No. 1:06-CV-00096-SPM, 2012 WL 4510855 (N.D. Fla. Oct. 1, 2012) ...............................13

*Lamm v. State St. Bank & Tr.*,
749 F.3d 938 (11th Cir. 2014) ...................................................................................15

*Macquarie Infrastructure Corp. v. Moab Partners, L. P.*,
601 U.S. 257 (2024)...................................................................................................11

*Mayer v. Carnival Corp.*,
No. 24-cv-20160, 2024 U.S. Dist. LEXIS 39101 (S.D. Fla. Mar. 6, 2024)
(Altman, J.) ..............................................................................................................8, 9

*Morris v. ADT Sec. Servs.*,
No. 07-cv-80950, 2009 WL 10691165 (S.D. Fla. Sept. 11, 2009).........................13

*Nuwave, Ltd. v. Argyll Equities, LLC*,
2007 U.S. Dist. LEXIS 79029 (M.D. Fla. Oct. 24, 2007) ......................................16

*In re Opus E., LLC*,
480 B.R. 561 (Bankr. D. Del. 2012) ......................................................................10

*Pop v. Lulifama.com LLC*,
145 F.4th 1285 (11th Cir. 2025) ...........................................................................9, 14

*Robbins v. Koger Properties, Inc.*,
116 F.3d 1441 (11th Cir.1997) ................................................................................11

*Snowstorm Acquisition Corp. v. Tecumseh Prods. Co.*,
739 F. Supp. 2d 686 (D. Del. 2010)........................................................................14

*Solution Z v. Alma Lasers, Inc.*,
No. 11-cv-21396, 2013 WL 12246356 (S.D. Fla. Jan. 22, 2013)...........................13

*Spiegel, Inc. v. Fed. Trade Comm'n*,
540 F.2d 287 (7th Cir. 1976) ...................................................................................13

*State Farm Mut. Auto. Ins. Co. v. First Choice Chiropractic & Rehab Ctr., Inc.*,
No. 8:20-cv-330, 2020 WL 5583516 (M.D. Fla. Aug. 17, 2020).............................9

*Sundance Apartments I, Inc. v. Gen. Elec. Cap. Corp.*,
581 F. Supp. 2d 1215 (S.D. Fla. 2008) ...................................................................13

*Tallabs, Inc. v. Makor Issues & Rights Ltd.*,
551 U.S. 308 (2007).................................................................................................12

*Turner v. Williams*,
65 F.4th 564 (11th Cir. 2023) .....................................................................................9

*Wilding v. DNC Servs. Corp.*,
941 F.3d 1116 (11th Cir. 2019) .............................................................................9, 15

**State Cases**

*Agspring Holdco, LLC v. NGP X US Holdings, L.P.*,
CV 2019-0567-AGB, 2020 WL 4355555 (Del. Ch. July 30, 2020)......................16

*AlixPartners, LLP v. Mori*,
No. CV 2019-0392-KSJM, 2022 WL 1111404 (Del. CH. Apr. 14, 2022).............10

*Bakerman v. Sidney Frank Importing Co.*,
 2006 WL 3927242 (Del. Ch. Oct. 10, 2006) ...............................................................16

*Clifford Paper, Inc. v. WPP Invs., LLC*,
 2021 WL 2211694 (Del. Ch. June 1, 2021)................................................................7, 15

*CLP Toxicology, Inc. v. Casla Bio Hldgs. LLC*,
 No. CV 2018-0783-PRW, 2021 WL 2588905 (Del. Ch. June 14, 2021) ................................10

*Croom v. Pressley*,
 1194 WL 466013 (Del. Super. July 29, 1994).........................................................15

*In re Doehler Dry Ingredient Sols., LLC*,
 No. 2022-0354-LWW, 2022 WL 4281841 (Del. Super. Sept. 15, 2022), *aff'd*
 294 A.3d 64 (Del. 2023) .............................................................................17

*Drug, Inc. v. Hunt*,
 168 A. 87 (Del. 1933) ...............................................................................9

*Fisk Ventures LLC v. Segal*,
 2009 WL 73957 (Del. Ch. Jan. 13, 2009)................................................................18

*Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I, LLLP*,
 CV 7906-VCG, 2014 WL 6703980 (Del. Ch. Nov. 26, 2014) .............................................16

*Kelly v. Blum*,
 No. 4516-VCP, 2010 WL 629850 (Del. Ch. Feb. 24, 2010) ..........................................7

*Kuroda v. SPJS Hldgs., LLC*,
 971 A.2d 872 (Del. Ch. 2009).......................................................................9, 16

*Rollins, Inc. v. Butland*,
 951 So. 2d 860 (Fla. 2d DCA 2006) ....................................................................13

*Samuels v. King Motor Co. of Fort Lauderdale*,
 782 So. 2d 489 (Fla. 4th DCA 2001) ..................................................................13

*Schock v. Nash*,
 732 A.2d 217 (Del. 1999) ............................................................................16

*Seokoh, Inc. v. Lard-PT, LLC*,
 No. 2020-0613-JRS, 2021 WL 1197593 (Del. Ch. Mar. 30, 2021).....................................18

*SpecialtyCare, Inc. v. MedCost, LLC*,
 No. 2025-0011-DH, 2026 WL 43202 (Del. Ch. Feb. 16, 2026).......................................17

*State v. Beach Blvd. Auto., Inc.*,
 139 So. 3d 380 (Fla. 1st DCA 2014) ..................................................................13

*Stone & Paper Invrs. v. Blanch*,
 No. 2018-0394-PAF, 2020 WL 3496694 (Del. Ch. June 29, 2020)....................................10

*Swan Energy, inc. v. Inv. Protection Unit of Del. Dep't of Justice*,
 341 A.3d 1036 (Del. Super. 2025)......................................................................14

*Tooley v. Donaldson, Lufkin & Jenrette, Inc.*,
 845 A.2d 1031 (Del. 2004) ..........................................................................7, 15

iv

*Walker v. Figarola*,
  59 So. 3d 188 (Fla. 3d DCA 2011) ........................................................................10

**Federal Statutes**

15 U.S.C. § 78u–4(b)(2)(A) ...................................................................................11

PSLRA, 15 U.S.C. § 78u-4(b) ...............................................................................11

**State Statutes**

6 Del. C. § 18-701 .................................................................................................10

6 Del. C. § 18-801(a)(3) .........................................................................................18

6 Del. C. § 18-802 .................................................................................................18

6 Del. C. § 18-1001 ............................................................................................7, 8

Fla. Stat. § 501.204 ...............................................................................................12

**Rules**

Fed. R. Civ. P. 8(a) ..................................................................................................8

Fed. R. Civ. P. 9 ...............................................................................................14, 16

Fed. R. Civ. P. 9(b) .............................................................................................9, 11

Fed. R. Civ. P. 12 ....................................................................................................1

Fed. R. Civ. P. 12(b)(6) ............................................................................................2

**Regulations**

17 C.F.R. § 240.10b-5 ...........................................................................................11

The L3 Funds[1] and Cardinale Defendants[2] (collectively, "Movants"), pursuant to Fed. R. Civ. P. 12, move to dismiss the *Class-Action and Derivative Complaint for Equitable Relief and Damages*[3] ("Compl." or "Complaint") and in support state as follows:[4]

## INTRODUCTION

Plaintiffs provide a Complaint that is deficient in many respects, including purporting to bring derivative claims inappropriately without first making demand upon the L3 Funds and their manager, L3 Capital Management, LLC ("L3 Manager").

While the Movants strongly support efforts to obtain relief on behalf of the L3 Funds and their investors in theory, it is the L3 Funds, their investment vehicles, and their manager who have the right to control these claims. The Movants have not abdicated that responsibility. Far from it, the L3 Funds, their investment vehicles, and L3 Manager (which is owned and controlled by Cardinale) have engaged in significant legal action to enforce, protect, and otherwise support the L3 Funds' legal rights and interests. Plaintiffs cannot take such matters into their own hands unilaterally. This Court should not permit Plaintiffs to proceed with derivative claims before they have satisfied the prerequisites necessary to do so.

Additionally, irrespective of the derivative standing issues, Plaintiffs' Complaint is incomplete and deficient in many respects. Count I for conversion is addressed to the Cardinale Defendants based purely on alleged conversion of money even though Delaware law does not permit such a conversion claim; Count III for securities fraud fails to allege with specificity the speaker, time, and place where the alleged misstatements were made, fails to specify to whom the misrepresentations were made, fails to allege scienter, and fails to allege how Plaintiffs purportedly relied on each alleged misrepresentation or omission before investing in the L3 Funds; Count IV seeks relief under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") without sufficient specificity and without sufficient connection between the alleged wrongful acts and the State of Florida; Count V for fraud simply ignores many of the most material elements of fraud as to the Cardinale Defendants; Count VII for negligence cannot be raised directly because all alleged

---

[1] The "L3 Funds" are L3 Capital Income Fund, LLC ("Income Fund"), L3 Capital Hotel Fund, LLC ("Hotel Fund"), and L3 Capital Special Opportunity Fund, LLC ("SO Fund").

[2] The "Cardinale Defendants" are Richard Cardinale, L3 Capital Management, LLC, L3 Capital Advisors, LLC, and RVCSI, LLC.

[3] ECF No. 1.

[4] Any capitalized but undefined terms share the same meaning as in the Complaint.

1

acts are addressed to alleged harm suffered by the L3 Funds, not the investors individually; Count VIII for civil conspiracy cannot survive without a sufficiently specific underlying tort; Count IX for unjust enrichment fails because the Cardinale Defendants' receipt of fees is controlled by express contractual agreements; and Count XIII for judicial dissolution is deficient because, apart from the jurisdictional concerns, Plaintiffs simply mischaracterize the current state of affairs of the L3 Funds. Accordingly, the Complaint should be dismissed as to the Movants.

## **BACKGROUND**[5]

### I.      **Introduction to the L3 Funds**

After spending decades as a financial and investment advisor, Defendant Richard Cardinale ("Cardinale") decided to raise capital to make direct investments in growth and steady cash flow industries like merchant cash advance, debt settlement, and real estate. (Compl. ¶ 63.) Cardinale first brought his idea to Defendant Michael Dazzo ("Dazzo"), his longtime friend and business associate, who advised Cardinale to share his idea with Defendant David Feingold ("Feingold"), an individual whom they both knew as a Florida licensed attorney with business relationships in various industries including with real estate development firms. (¶ 64.) Because Feingold held himself out as an experienced attorney with significant institutional contacts, Cardinale included Feingold in the venture and accepted much of Feingold's advice and direction on the formation, structure, and investments of what ultimately became the L3 Funds. (¶¶ 65–69, 164, 167, 199, 213, 233, 245.) There are three L3 Funds: the Income Fund, Hotel Fund, and SO Fund. (¶¶ 13–15.)

Among these structural recommendations were specific roles for each of Cardinale, Feingold, and Dazzo. Cardinale would manage the L3 Funds and handle the raising of capital and other aspects of the L3 Funds' relationships with investors, Feingold would manage the day-to-day operations of the L3 Funds' investments (often through the L3 Funds' investment vehicles), and Dazzo would act as the comptroller. (¶¶ 69, 164.) Cardinale raised nearly $150 million from approximately 100 individual investors (including himself and his family) to fund the L3 Funds and their various investments. (¶¶ 21, 67.) Feingold and Dazzo, meanwhile, had significant oversight and control over many of the day-to-day operations of the L3 Funds and their investment

---

[5] This Background Section presumes all well pleaded facts as true as required on a motion to dismiss under Rule 12(b)(6). The Movants do not, by any representation herein, admit any particular fact alleged in the Complaint. Unless otherwise stated, all citations in this section are to the Complaint.

vehicles, including the management of their books and records and their relationships with the various companies they made investments with. (¶ 74.) However, "Feingold and Dazzo invested exactly $0 in the L3 Funds." (¶ 76.)

## II.   Feingold's Conspiracy to Defraud the L3 Funds, the Investors, and Cardinale.

Cardinale did not know it, but "Feingold was a wolf inviting himself into the proverbial hen house." (¶ _.) Starting at that first meeting, Feingold set in motion a convoluted conspiracy that allowed him to covertly usurp control of the L3 Investments so that he could misappropriate investors' assets and line his own pockets." (¶ 66.)

### A.   The Income Fund

The Income Fund (i) raised capital from individual investors; (ii) loaned that capital to six separate investment vehicles that were jointly owned and managed by Cardinale, Feingold, and Dazzo pursuant to a revolving note and security agreement;[6] and (iii) received payments on the loans when the investment vehicles received returns.[7] The Income Fund raised approximately $81 million and loaned those funds to the Income Fund Investment Vehicles. (¶¶ 79–80.)

At Feingold's direction, the Income Fund issued loans to the Income Fund Investment Vehicles to make investments with, among others, (1) Samson Horus, LLC ("Samson"), a New York merchant cash advance company; (2) Blackstream Development, LLC ("Blackstream"), a South Carolina  real estate development firm; (3) DGGs, various debt settlement companies, and (4) Durham Homes, LLC ("Durham"), a South Carolina custom homebuilder. (¶¶ 81, 82, 106, 116.) Feingold had significant undisclosed relationships with several of these companies. (¶¶ 84 ("Feingold held direct or indirect undisclosed interests or influence in Samson and received substantial sums in 'management fees' and 'commissions' connected to portfolios in which [the Income Fund Investment Vehicles] were invested."), 86 ("Feingold has received and continues to receive 20% of the commissions and 50% of the management fees that Samson has deducted and received from the [ ] Income Fund's portfolio, but Feingold never disclosed those commissions

---

[6] The investment vehicles for the Income Fund are Alternative Global One, LLC, Alternative Global Two, LLC, Alternative Global Three, LLC, Alternative Global Four, LLC, Alternative Global Five, LLC, and Alternative Global Six, LLC (collectively, "AG 1-6" or "Income Fund Investment Vehicles"). *Id.*, ¶ 17 n. 7.

[7] Any excess profits were payable to a profit participation entity, Alternative Global Management, LLC ("AGM") which allowed "[i]nvestors who invested $1 million or more in the [ ] Income Fund" to participate in excess profits." *Id.*, ¶ 68 n. 12.

and fees he received from Samsom …"), 109 ("Feingold and/or the Baldassarra brothers hold direct or indirect undisclosed equity, control, or other financial interests in Blackstream and/or the Blackstream Projects."), 119 ("JDS—an entity owned by Feingold and the Baldassarras—was at all times the majority member of Durham Homes. Feingold, through JDS, functionally controlled all financial decision-making for Durham Homes.").)

### B.    The Hotel Fund

The Hotel Fund was created to hold and make investments in hotel projects, including: (a) the Asheville Hotel Project; (b) the Raleigh Hotel Project; (c) the North Myrtle Beach Hotel Project; and (d) the Ormond Beach Hotel Project. (¶ 162.) Primarily through Cardinale's efforts, the Hotel Fund projects collectively raised approximately $47 million, and monies were then deployed into the various hotel projects at the direct of Feingold. (¶ 165.) Feingold also directed some of the funds to be invested with Samson pending requests for funds from Blackstream relating to the hotel projects. (¶¶ 186–189, 206–207, 222–225.) Yet again, Feingold took the millions that the Hotel Fund raised and directed it into opportunities that he held undisclosed interests in and Feingold and his co-conspirators hijacked management and control over these investments. (¶¶ 188-190, 197, 208, 210-212, 229-232, 241-244.) There is no allegation that the Cardinale Defendants are in possession, custody, or control over these assets which allegedly have been converted and misappropriated by Feingold and his co-conspirators.

### C.    The SO Fund

The SO Fund was created to invest in an opportunity that Feingold identified for commercial real estate development projects on undeveloped outparcels in Gaffney, South Carolina (collectively, "Gaffney Outparcels"). (¶ 245.) Primarily through Cardinale's efforts,[8] the SO Fund raised over $15 million to develop the Gaffney Outparcels. (¶ 255.)  Yet again, Feingold directed the amount of funds to be deployed to Blackstream for these projects and then allegedly hijacked the investment to the detriment of the SO Fund and L3 Investors. (¶¶ 256-259.)

---

[8] As alleged in the Complaint, Defendants Daniel Amaneria and Todd Sanders solicited investors to invest in the L3 Funds.  Although most L3 investors had prior relationships with Cardinale, several of the named plaintiff investors were previously unknown to Cardinale and were solicited by Defendants Amaneria and Sanders.  (¶¶ 35-36, 78, 136 n.30.)

### D.       *Feingold and Broadstreet Hijack the L3 Funds' Investments.*

As alleged in the Complaint, "Feingold teamed up with the Baldassarras and their investment fund, Broadstreet, to transfer the L3 Assets into Broadstreet or to otherwise use Broadstreet to invest in the same projects as the L3 Funds, thus intentionally diluting the L3 Assets' value to the benefit of Broadstreet." (¶ 260.) Beginning at least August 2021, Feingold and Dazzo began flying investors and investment advisors, many of whom invested in the L3 Funds, to Greenville, South Carolina on Feingold's private jet to solicit investment in Broadstreet; these investors were often falsely informed that Broadstreet was somehow related to the L3 Funds. (¶ 261–262.)

As further described in the Complaint, Feingold and Broadstreet then outright stole or misappropriated the L3 Funds' assets, they improperly diluted or devalued the L3 Assets, and/or they breached the L3 Funds' relationships with the investment companies. (¶ 263.) Feingold was able to achieve this through his control not only of the L3 Funds' relationships with the investment companies, but through his simultaneous direct or indirect control of Broadstreet and the investment companies (e.g., Blackstream and Durham) themselves. For example, after Feingold told Cardinale that no additional funding was needed for Durham, Feingold constructed a loan agreement between Broadstreet and Durham that diluted and/or entirely devalued the Income Fund's Investment Vehicle's investment in Durham. (¶ 264.) Shortly thereafter, in November 2021, Feingold allegedly executed a purported "termination agreement" without notice or approval from Cardinale or the L3 Funds to give Broadstreet complete ownership and control over certain investments, including Blackstream infrastructure projects that the Income Fund had provided more than $17 million to fund. (¶ 278.)

Cardinale began to uncover Feingold and Dazzo's deception in approximately December 2021, when he traveled to South Carolina and witnessed first-hand Feingold soliciting investors to invest in Broadstreet by selling the L3 Assets or, at the very least, opportunities that would necessarily dilute the L3 Assets or disrupt the L3 Funds' relationships with their investments. (¶ 267.) Cardinale demanded an explanation and more detailed information about the status of the investments; Feingold and Dazzo refused to provide either. (¶ 268.) Instead, Feingold and Dazzo demanded a buyout and Feingold threatened Cardinale. (¶ 269–271.) Feingold and Dazzo had facially no right to a buyout because they had no interest in any of the L3 Funds and their

membership interest in the Income Fund's Investment Vehicles allegedly had no value. (¶ 271.) Cardinale refused their buyout demand. (¶ 272.)

On January 28, 2022, Feingold and Dazzo resigned as managers and members of the Income Fund's Investment Vehicles and demanded fair value for their resigned membership interests. (¶ 273.) Upon their resignations, Feingold and Dazzo absconded with the Income Fund's Investment Vehicles' books and records. (¶ 274.) They also directly colluded with their co-conspirators at Samson, Blackstream, Durham, and elsewhere, to deprive the L3 Funds of the ability to obtain books and records or to manage and control their own investments. (¶ 275.)

In June 2022, Feingold became the CEO of Broadstreet, Inc. ("BSI"), and Dazzo became a Senior Managing Director of BSI. (¶ 279.) Feingold thus not only conspired to harm the L3 Funds and their investors by secretly making investments to line his own pockets rather than support the L3 Funds and their investors, but he also then diverted the assets into an entirely different fund, owned and controlled by his other business partners, which he now largely controls as well. Feingold and the Baldassarras are now parties in a pending lawsuit by the SEC in this district relating to their actions as Broadstreet's principals, and their alleged "co-mingling" of investment funds. (¶¶ 10, 30, 85, 88 n. 19, 188, 278.) Feingold and Broadstreet have since repeatedly acknowledged that they continue to improperly own and/or control the L3 Assets. (¶¶ 282–287.)

Relatedly, Blackstream and its related entities (controlled and influenced by Feingold) continue to withhold all information and rights related to the assets the L3 Funds spent more than $50 million purchasing. (¶¶ 292–301.)

### III.     Nature of the Allegations Against the Cardinale Defendants

The Cardinale Defendants have been lumped together with the Feingold Defendants into many causes of action in the Complaint, including: (a) Count I (Conversion); (b) Count III (Securities Fraud); (c) Count IV (FDUTPA); (d) Count V (Fraud); (e) Count VII (Negligence); (f) Count VIII (Civil Conspiracy); and (g) Count IX (Unjust Enrichment). But the factual allegations themselves tell a fundamentally different story. Cardinale is not alleged to have been a part of the Feingold conspiracy that usurped the rights and interests of the L3 Funds and their investors. In fact, the Complaint repeatedly acknowledges in many places the significant efforts Cardinale has taken to protect, secure, and restore the rights of the L3 Funds and their investors. (*See, e.g.*, ¶¶ 267, 287–289.) The factual allegations, as more particularly described and discussed below, really

only identify two specific things that Cardinale allegedly did incorrectly: (1) negligently manage the L3 Funds in a manner that allowed Feingold to succeed in his fraudulent conspiracy; and (2) receiving fees from the L3 Funds that Plaintiffs believe he should not have received. While there are allegations of wrongdoing against the Cardinale Defendants in this case, it is imperative that there be a significant distinction drawn between the alleged wrongful conduct of Feingold and his co-conspirators and the Cardinale Defendants.

## MEMORANDUM OF LAW

### I.     Plaintiffs Lack Derivative Standing to Proceed on Claims Belonging to the L3 Funds.

The L3 Funds are Delaware LLCs. (Compl., ¶¶ 13–15.) Under applicable Delaware law, the members of an LLC generally cannot sue directly for injuries of the LLC itself; instead, to bring claims for injuries suffered by the LLC, the members must bring their claims derivatively. *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1039 (Del. 2004).[9] Essentially, the inquiry is: "'(1) who suffered the alleged harm (the [LLC] or the suing [member], individually); and (2) who would receive the benefit of any recovery or other remedy (the [LLC] or the [members], individually)?" *Clifford Paper, Inc. v. WPP Inv'rs, LLC*, No. CV 2020-0448-JRS, 2021 WL 2211694, at *6 (Del. Ch. June 1, 2021) (quoting *Tooley*, 845 A.2d at 1039); *contra. Kelly v. Blum*, No. 4516-VCP, 2010 WL 629850, at *11 (Del. Ch. Feb. 24, 2010) (finding manager breached fiduciary duty to a specific minority member by entering into a merger "designed solely to eliminate [the plaintiff's] interest" in the LLC). Plaintiffs seemingly understand this, bringing each of their thirteen causes of action, at least in part, derivatively on behalf of the L3 Funds. (*See* Compl., pp. 97–114.)

To proceed derivatively, members must either make an initial demand for the company to act, which the company must then deny or, alternatively, sufficiently allege that demand would be futile. *Clifford Paper*, 2021 WL 2211694, at *6 ("The member's right to bring the action is conditioned upon a determination that 'managers or members with authority ... have refused to bring the action or if an effort to cause those managers or members to bring the action is not likely to succeed.'" (quoting 6 Del. C. § 18-1001)). Plaintiffs admit they made no demand, but claim that

---

[9] Corporate and LLC derivative principles are identical in all relevant respects. *Clifford Paper, Inc. v. WPP Invs., LLC*, 2021 WL 2211694, at *6 (Del. Ch. June 1, 2021) ("[C]ase law governing corporate derivative suits is equally applicable to suits on behalf of an LLC.").

doing so would be futile because their Complaint alleges wrongdoing against Cardinale, who owns and controls the manager of the L3 Funds (L3 Manager). This is misrepresentative.

Since discovering Feingold, Dazzo, and their co-conspirators' malfeasance, the L3 Funds, their investment vehicles, and Cardinale personally have been engaged in a significant effort to expose their actions and secure recovery on behalf of the L3 Funds and their investors, including Plaintiffs. An appendix detailing many of the relevant legal actions undertaken, including some which are active and in progress, by the L3 Funds, their investment vehicles, and Cardinale is attached as **Exhibit 1**.[10] As shown therein, there are no less than *twelve* actions where the L3 Funds, the investment vehicles, or Cardinale have taken legal action to enforce, protect, or support the rights of the L3 Funds and their investors. These efforts seek to enforce nearly all the rights pursued by Plaintiffs derivatively on the L3 Funds' behalf in this case.[11]

It is impossible for Plaintiffs to argue that demand to act would be futile when the L3 Funds, their investment vehicles, and Cardinale himself have already acted to enforce precisely the same rights and interests Plaintiffs seek to enforce here. 6 Del. C. § 18-1001 (confirming that members only have authority to proceed derivatively "if managers or members with authority to do so have *refused to bring the action* or if an effort to cause those managers or members to bring the action is not likely to succeed") (emphasis added). Plaintiffs cannot simply claim futility and wrestle control of these active claims from the L3 Funds. The Court should dismiss Plaintiffs' derivative claims to the extent that they overlap with the substantive rights already pursued, enforced, and/or defended by the L3 Funds, their investment vehicles, and Cardinale personally.

## II.     Plaintiffs Otherwise Fail to State a Cause on Action Against Movants.

Under Fed. R. Civ. P. 8(a), complaint must "'state a claim [for] relief that is plausible on its face.'" *Mayer v. Carnival Corp.*, No. 24-cv-20160, 2024 U.S. Dist. LEXIS 39101, at *2 (S.D. Fla. Mar. 6, 2024) (Altman, J.) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell*

---

[10] The L3 Funds and Cardinale Defendants will, by separate notice of filing, provide the Court with copies of the relevant document(s) and request that the Court take judicial notice of the existence of these court filings.

[11] In a related case, Broadstreet alleges that the L3 Funds and Cardinale Parties entered into a common interest agreement with various L3 investors, including Plaintiffs' Counsel and Plaintiff Anthony Siriani,  to collectively pursue the L3 Funds' interests. Such a common interest agreement is, naturally, antithetical to a denial or refusal to pursue claim; to the contrary, it is an affirmative representation of intent to do so. *See Broadstreet Global Management, LLC v. Cardinale et al.*, No. 1:25-cv-20031-RKA, ECF Nos. 85 & 89 (S.D. Fla.).

*Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim has facial plausibility when the pleaded factual content "'allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Mayer*, 2024 U.S. Dist. LEXIS 39101, at *2 (citing *Iqbal,* 556 U.S. at 678). The pleadings must provide more than "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements[.]" *Iqbal,* 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). Though this standard does not require "detailed" allegations, it requires "more than an unadorned, the-defendant-harm-me accusation." *Mayer*, 2024 U.S. Dist. LEXIS 39101, at *2 (citing *Iqbal,* 556 U.S. at 678). While the Court generally limits its review to the four corners of the complaint, it may consider exhibits attached to the complaint or incorporated by reference into it. *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005). If an incorporated document contradicts the allegations, the document controls. *Turner v. Williams*, 65 F.4th 564, 583 n.27 (11th Cir. 2023).

If a claim sounds in fraud, it must satisfy a heightened pleading standard. Fed. R. Civ. P. 9(b); *Pop v. Lulifama.com LLC*, 145 F.4th 1285, 1292–96 (11th Cir. 2025); *Wilding v. DNC Servs. Corp.*, 941 F.3d 1116, 1127 (11th Cir. 2019); *Cardenas v. Toyota Motor Corp.*, 418 F. Supp. 3d 1090, 1098 (S.D. Fla. 2019). Under Rule 9(b), a complaint must provide "indicia of reliability" by pleading "facts as to time, place, and substance of the defendant's alleged fraud, specifically the details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them." *F&F Invs. Grp. v. Case (In re Case)*, 636 B.R. 852, 857-58 (Bankr. S.D. Fla. 2022). "Essentially, a plaintiff satisfies Rule 9(b) by alleging who, what, when, where, and how." *Id.* at 858 (quoting *State Farm Mut. Auto. Ins. Co. v. First Choice Chiropractic & Rehab Ctr., Inc.*, No. 8:20-cv-330, 2020 WL 5583516, at *2 (M.D. Fla. Aug. 17, 2020)).

The following counts apply to the Movants: (a) Count I (Conversion); (b) Count III (Securities Fraud); (c) Count IV (FDUTPA); (d) Count V (Fraud); (e) Count VII (Negligence); (f) Count VIII (Civil Conspiracy); (g) Count IX (Unjust Enrichment); and (h) Count XIII (Judicial Dissolution of the L3 Funds). Plaintiffs fail to state a cause of action as to any of these claims.

### A.    *Count I (Conversion)*

"Conversion is 'any distinct act of dominion wrongfully exerted of the property of another, in denial of [the plaintiff's] right, or inconsistent with it." *Kuroda v. SPJS Hldgs., LLC*, 971 A.2d 872, 889 (Del. Ch. 2009) (quoting *Drug, Inc. v. Hunt*, 168 A. 87, 93 (Del. 1933)). The elements of conversion require that: (1) the plaintiff "had a property interest in the converted goods;" (2) that the plaintiff "had a right to possession of the goods;" and (3) "the property was converted."

*AlixPartners, LLP v. Mori*, No. CV 2019-0392-KSJM, 2022 WL 1111404, at *24 n. 208 (Del. CH. Apr. 14, 2022) (quoting *CLP Toxicology, Inc. v. Casla Bio Hldgs. LLC*, No. CV 2018-0783-PRW, 2021 WL 2588905, at *11 (Del. Ch. June 14, 2021)). Cardinale is alleged to have converted only one category of property: $24.6 million "siphoned away … to bank accounts" without the L3 Investors' knowledge or permission. Compl., ¶ 346.

Initially, Plaintiffs cannot proceed on these claims directly because "[a] member of a limited liability company has no interest in the specific assets owned by the limited liability company" such that the member could sue for conversion of it. *Stone & Paper Invrs. v. Blanch*, No. 2018-0394-PAF, 2020 WL 3496694, at *10 n. 40 (Del. Ch. June 29, 2020) (citing 6 Del. C. § 18-701); *see also In re Opus E., LLC*, 480 B.R. 561, 575 (Bankr. D. Del. 2012) (explaining that just as a shareholder has no personal or individual right of action against a third party for acts causing interest to a corporation, a member (or the member's trustee) does not have a property interest in the limited liability company's property); *Walker v. Figarola*, 59 So. 3d 188, 190 (Fla. 3d DCA 2011) ("[A] simple monetary debt generally cannot form the basis of a claim for conversion[,]" but a conversion claim may be brought where there is "'an obligation to keep intact or delivery the specific money in question, so that money can be identified.'") (citations omitted).. To whatever extent a conversion claim can theoretically lie at all, Plaintiffs can only seek relief derivatively and, as previously discussed, Plaintiffs cannot properly proceed derivatively here.

Notwithstanding, the Cardinale Defendants further note that Plaintiffs cannot seek recovery on a conversion claim based on alleged conversion of money. Absent limited exceptions not alleged here, "an action in conversion will not lie to enforce a claim for the payment of money." *Stone & Paper Invrs.*, 2020 WL 3496694, at *11; *see also CLP Toxicology*, 2021 WL 2588905, at *14 (dismissing conversion claim for converted money when the pleading included no allegation that the conversion claim fell "within the narrow-recognized exception—*i.e.* that [the counter-defendant] ha[d] an obligation to return the 'identical money' allegedly owed"). Thus, to whatever extent Plaintiffs can proceed on their derivative claims at all, their conversion count is still deficient because it is based on the alleged conversion of non-specific monies.

### B.     Count III (Securities Fraud)

To allege a 10b-5 securities fraud claim within the 11th Circuit,  Plaintiffs must allege with particularity: (1) a material misrepresentation or omission, (2) made with scienter (intent or recklessness), (3) in connection with the purchase or sale of securities, (4) reasonable reliance,

(5) economic loss, and (6) loss causation. 17 C.F.R. § 240.10b-5; *Robbins v. Koger Properties, Inc.,* 116 F.3d 1441, 1447 (11th Cir.1997); *Bruschi v. Brown,* 876 F.2d 1526, 1528 (11th Cir.1989); *see also* the heightened pleading requirements under the PSLRA, 15 U.S.C. § 78u-4(b), and Fed. R. Civ. P. 9(b).  To the extent plaintiffs allege an omission or a failure to disclose, plaintiffs must allege a duty to disclose because silence alone is not actionable. *Macquarie Infrastructure Corp. v. Moab Partners, L. P.*, 601 U.S. 257 (2024).

Here, Plaintiffs have not alleged any of the necessary elements with particularity.  Plaintiffs generally allege that "Feingold, Dazzo, Sanders, Amaniera, Cardinale (and potentially others)" were paid "undisclosed and unfair compensation," (¶ 381(b)) and they supposedly "disseminated or approved" false and misleading representation or omissions  (¶368), but Plaintiffs do not specify the "who, what, when, where, why, or how" the content of alleged misstatements or omissions "in connection with their purchase" of the L3 Funds' investments.

Moreover, Plaintiffs totally ignore express disclosures in the L3 Funds' PPMs and Operating Agreements, including disclosures regarding compensation and fees.  Indeed, the L3 Funds' PPMs state, among other things, that "officers, directors, managers, and/or members" of a potential investment "may receive fees for services" or serve as a "paid advisor," while the manager of a potential "Investment" and its "members and affiliates" "may receive directors' fees, breakup fees, consulting fees, monitoring fees and other fees in connection with the provision of consulting services and other services to an Investment. (Exhibit --, PPM at 6-7, 18, 33.)  These and other disclosures in the solicitation materials address the various types of roles and compensation that the L3 Funds and Cardinale Defendants would receive related to the L3 Funds' management and its investments, as well as corresponding risk.  Plaintiffs have not shown how these disclosures are false or any duty to provide more detailed information regarding fees than was already provided to investors.

Plaintiffs also fail to adequately plead scienter.  Rule 10b-5 claims require "an 'intent to defraud or severe recklessness on the part of the defendant.'" *Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1318 (11th Cir. 2019) (quoting *FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1299 (11th Cir. 2011)). The PSLRA requires that, "'with respect to each act or omission alleged,' [ ] a complaint 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Carvelli*, 934 F.3d at 1318 (quoting 15 U.S.C. 15 U.S.C. § 78u–4(b)(2)(A)). "[A] 'strong inference' is one that is 'cogent and at least as compelling as any

11

opposing inference one could draw from the facts alleged.'" *Carvelli*, 934 F.3d at 1318 (quoting *Tallabs, Inc. v. Makor Issues & Rights Ltd.*, 551 U.S. 308, 324 (2007)). "Although scienter may be inferred from an aggregate of factual allegations, it must be alleged with respect to each alleged violation of the statute." *Carvelli*, 934 F.3d at 1318 (quoting *FindWhat*, 658 F.3d at 1296).

Here, the Complaint does not allege the particular circumstances of any purported omission or representation made by any particular Defendant to any particular plaintiff in connection with their solicitation and ultimate purchase of their L3 Funds investment. Accordingly, there is no way to find that circumstances indicated conscious or reckless behavior by the L3 Funds or Cardinale Defendants at any time before Plaintiffs invested. Plaintiffs also have not alleged the Cardinale Defendants' motive and opportunity. Indeed, Plaintiffs have not alleged that Cardinale was motivated by anything other than what any investment manager wants – funds to invest and related fees. *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1286-86 (11th Cir. 1999) ("reject[ing] the notion that allegations of motive and opportunity to commit fraud, standing alone, are sufficient to establish scienter" and explaining that such allegations may be "relevant" but "without more, are not sufficient to demonstrate the requisite scienter" for a 10b-5 claim).

Plaintiffs also failed to adequately plead reasonable reliance. To establish their reliance was justified or reasonable, a plaintiff must specify what false statements they relied on and how reliance on those specific misrepresentations led them to engage in the relevant transaction. *Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 568 U.S. 455, 461 (2013). Without sufficient detail identifying who made a statement and when it was made, in addition to who heard the statement, and if and when they subsequently invested, it is impossible to determine if Plaintiffs could have reasonably relied on the purported misstatement or omission.  Accordingly, Plaintiffs' 10b-5 securities fraud claim fails for this reason as well.

### C.    Count IV (FDUTPA)

FDUTPA prohibits "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204. Initially, "FDUTPA applies only to actions that occurred within the state of Florida." *Garret-Alfred*, 540 F. Supp. 3d at 1141 n.5 (M.D. Fla. 2021) (quoting *Five for Ent. S.A. v. Rodriguez*, 877 F. Supp. 2d 1321, 1330–31 (S.D. Fla. 2012)). Nothing in the Complaint supports permitting the extension of a FDUTPA claim to the Cardinale Defendants based on alleged wrongful conduct that occurred in the State of Florida; certainly, no such conduct can be applied as to Plaintiffs that are not Florida

12

residents without sufficient wrongful conduct in Florida itself to trigger FDUTPA's application. *See, e.g.*, *Morris v. ADT Sec. Servs.*, No. 07-cv-80950, 2009 WL 10691165, at *6–9 (S.D. Fla. Sept. 11, 2009) (concluding that the Commerce Clause precluded application of FDUTPA to out-of-state class members even though defendant was headquartered in Florida). It is unclear how Plaintiffs, especially out-of-state Plaintiffs, could proceed on a FDUTPA claim against the Cardinale Defendants, none of whom are Florida citizens or otherwise specifically alleged to have engaged in wrongful conduct in Florida.

Notwithstanding, "[t]o state a FDUTPA claim, a plaintiff must allege '(1) a deceptive act or unfair practice, (2) causation, and (3) actual damages.'" *Garret-Alfred v. Facebook, Inc.*, 540 F. Supp. 3d 1129, 1141 (M.D. Fla. 2021) (quoting *State v. Beach Blvd. Auto., Inc.*, 139 So. 3d 380, 393 (Fla. 1st DCA 2014)). "Generally, the standard for proving the existence of a deceptive act is different than the standard for proving an unfair practice." *Solution Z v. Alma Lasers, Inc.*, No. 11-cv-21396, 2013 WL 12246356, at *5 (S.D. Fla. Jan. 22, 2013) (quoting *Hill v. Hoover Co.*, No. 1:06-CV-00096-SPM, 2012 WL 4510855, at *4 (N.D. Fla. Oct. 1, 2012)). "A deceptive practice is one that is 'likely to mislead' consumers." *Rollins, Inc. v. Butland*, 951 So. 2d 860, 869 (Fla. 2d DCA 2006). An unfair trade practice "'offends established public policy' and . . . is 'immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.'" *Samuels v. King Motor Co. of Fort Lauderdale*, 782 So. 2d 489, 499 (Fla. 4th DCA 2001) (quoting *Spiegel, Inc. v. Fed. Trade Comm'n*, 540 F.2d 287, 293 (7th Cir. 1976)).

To the extent Plaintiffs' FDUTPA claim is based on undisclosed fees, such fees were expressly disclosed in the L3 Funds' private placement memoranda. (*See, e.g.*, Compl., ¶ 381(b) (raising FDUTPA allegations based on what Plaintiffs describe as "obfuscatory investment structures" that permitted "undisclosed and unfair compensation") & Exs. B, pp. 8-9, 14-15, 20, 38, 61, 65-66, 71-72, 75, 121, C, pp. 8-9, 14-15, 20, 38, 61, 65-66, 71-72, 75, 120, D, pp. 12-13, 21-22, 31, 33, 57-58, 61-62, & G, pp. 10-11, 19-20, 30, 58, 60.) A written agreement is only deceptive if it is intentionally misleading or masks its true purposes or effects. *See, e.g.*, *Solution Z*, 2013 WL 12246356, at *7–11 (concluding that a contract's plain language rebutted plaintiff's claim of "deceptive" practices); *Double AA Int'l Inv. Grp. v. Swire Pac. Hldgs.*, 674 F. Supp. 2d 1344, 1356–57 (S.D. Fla. 2009) (finding a reasonable person could not be deceived by the plain language of a contractual provision); *Sundance Apartments I, Inc. v. Gen. Elec. Cap. Corp.*, 581 F. Supp. 2d 1215, 1221 (S.D. Fla. 2008) (denying dismissal of FDUTPA claim when a contract's

"yield maintenance" provisions entitled the defendant to fees far in excess of "the plain meaning and understanding of the term 'yield maintenance'"). Similarly, it is almost never "unfair" for parties to bound by the terms of a contract. *See, e.g.*, *Double AA Int'l Inv. Grp.*, 674 F. Supp. 2d at 1357 (finding no violation of FDUTPA when "the contract was clear that there was no right of assignment without [defendant's] approval"). Thus, even if Plaintiffs clarify their other allegations under FDUTPA, they cannot proceed on claims based upon the Cardinale Defendants' receipt of plainly disclosed fees.

Lastly, Plaintiffs' FDUPTA claim is based on a laundry list of nine broad allegations of misconduct that appear to be simultaneously jointly and severally attributed to every defendant. (*See* Compl., ¶ 381(a)–(i).) This sort of group pleading is not permitted, especially under the heightened pleading standard under Rule 9. *Pop*, 145 F.4th at 1294–96 (explaining "that FDUTPA claims that sound in fraud must comply with Rule 9(b)'s particularity requirement" and concluding that claims involving misrepresentations or omissions sounded in fraud even if styled as FDUTPA-based); *In re FTX Cryptocurrency Exchange Collapse Litig.*, 781 F. Supp. 3d 1324, 1347 (S.D. Fla. 2025) (concluding FDUTPA claim sounded in fraud "because the gravamen of the [Class Action Complaint] is that Defendants' conduct 'contributed both to the perpetration of the fraud, and to the sale of unregistered securities, in a vital way'"). The Cardinale Defendants cannot adequately respond to the allegations in Count IV because they lack particularity and, in doing so, ascribe to them broad accusations of misconduct that seemingly, by the rest of the Complaint itself, should not apply to them.

### D.     *Count V (Fraud)*

The elements of common law fraud are: (1) "a false representation, usually one of fact, made by the defendant;" (2) "the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth;" (3) "an intent to induce the plaintiff to act or to refrain from acting;" (4) "the plaintiff's action or inaction taken in justifiable reliance upon the representation;" and (5) "damage to the plaintiff as a result of such reliance." *Swan Energy, inc. v. Inv. Protection Unit of Del. Dep't of Justice*, 341 A.3d 1036, 1052 (Del. Super. 2025). "There are three recognized species of common law fraud: (1) affirmative falsehoods; (2) active concealment; and (3) silence in the face of a duty to speak." *Snowstorm Acquisition Corp. v. Tecumseh Prods. Co.*, 739 F. Supp. 2d 686, 708 (D. Del. 2010).

14

Initially, the face of the Complaint, whether in the fraud claim or otherwise, fails to plead with sufficient specificity (1) any knowingly false misrepresentation or omission by any of the Cardinale Defendants, (2) any intent by the Cardinale Defendants to induce Plaintiffs to act based on any knowingly false misrepresentation or omission; or (3) any actual reliance upon the Cardinale Defendants' allegedly knowingly false and intentional misrepresentation or omission. *See* Compl., ¶¶ 384–394. Without such allegations, Count V simply cannot proceed.

Moreover, to the extent it could proceed, the L3 Funds' PPM provides significant disclosures on the issues relating to payment of fees from the L3 Funds. (*See* Compl., ¶ 390 & Exs. B, pp. 8-9, 14-15, 20, 38, 61, 65-66, 71-72, 75, 121, C, pp. 8-9, 14-15, 20, 38, 61, 65-66, 71-72, 75, 120, D, pp. 12-13, 21-22, 31, 33, 57-58, 61-62, & G, pp. 10-11, 19-20, 30, 58, 60.) The L3 Funds' PPMs are the sole source of representations to the L3 Investors in connection with the purchase or sale of securities. *See* **Exhibit 2**. To the extent Plaintiffs rely on alleged representations beyond the PPMs, they cannot proceed.

### E.      Count VII (Negligence)

"In a negligence action, the plaintiff must prove the existence of four elements: (1) a duty owed to the plaintiff by the defendant, (2) defendant's breach of that duty, (3) injury suffered, and (4) a particular causal relationship-generally described as 'proximate cause'—between the injury and the breach of duty." *Croom v. Pressley*, 1194 WL 466013, at \*2 (Del. Super. July 29, 1994). Plaintiffs' claim that the Cardinale Defendants mismanaged the L3 Funds, which resulted in damage to them as investors. (*See* Compl., ¶¶ 405–411.) Such damage is merely incidental to their ownership interest in the L3 Funds, and thus Plaintiffs can only proceed on their negligence claim to the extent that they have derivative standing to do so. *Tooley*, 845 A.2d at 1039; *see, e.g.*, *Clifford Paper*, 2021 WL 2211694, at \*10–11 (finding breach of fiduciary duty claim could only be brought derivatively because the harm to owners was indirectly caused through the harm that befell the company). Moreover, if Plaintiffs' claim relies on any purported negligent misrepresentations, "'Rule 9(b)'s heightened pleading standard applies to negligent misrepresentation claims' asserted under Florida law because such claims sound in fraud." *Wilding*, 941 F.3d at 1127 (quoting *Lamm v. State St. Bank & Tr.*, 749 F.3d 938, 951 (11th Cir. 2014)).

### F.      Count VIII (Civil Conspiracy)

The elements for civil conspiracy are: "(i) a confederation or combination of two or more persons; (ii) an unlawful act done in furtherance of the conspiracy; and (iii) damages resulting

from the action of the conspiracy parties." *Agspring Holdco, LLC v. NGP X US Holdings, L.P.*, CV 2019-0567-AGB, 2020 WL 4355555, at *21 (Del. Ch. July 30, 2020) (quoting *Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I, LLLP*, CV 7906-VCG, 2014 WL 6703980, at *20 (Del. Ch. Nov. 26, 2014)). Civil conspiracy requires the existence of an underlying tort, and to the extent that underlying tort sounds in fraud, the civil conspiracy count must also satisfy Rule 9. *Altimas v. Whitney*, No. 2:09-cv-682, 2010 WL 11507317, at * (M.D. Fla. Dec. 9, 2010) ("When the underlying tort in a conspiracy claim is fraud, the plaintiff must plead the facts supporting the conspiracy claim with specificity, pursuant to Federal Rule of Civil Procedure 9(b)." (quoting *Nuwave, Ltd. v. Argyll Equities, LLC*, 2007 U.S. Dist. LEXIS 79029, at *9-10 (M.D. Fla. Oct. 24, 2007))). Here, Plaintiffs' civil conspiracy claim is wildly overbroad and, in the context of the Complaint's own allegations, makes little sense. It is difficult to discern which allegations actually apply to the civil conspiracy claim against the L3 Funds and Cardinale Defendants, which is problematic because many of the potentially relevant causes of action that could provide an underlying tort must be plead with particularity. To whatever extent any of those torts survive, the civil conspiracy claim as against the L3 Funds and Cardinale Defendants should be dismissed for failing to plead with sufficient particularly.

### G.      Count IX (Unjust Enrichment)

"Unjust enrichment is 'the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience.'" *Kuroda v. SPJS Hldgs., LLC*, 971 A.2d 872, 891 (Del. Ch. 2009) (quoting *Schock v. Nash*, 732 A.2d 217, 232 (Del. 1999)). "When a complaint alleges an express, enforceable contract that controls the parties' relationship … a claim for unjust enrichment will be dismissed." *Kuroda*, 971 A.2d at 891 (quoting *Bakerman v. Sidney Frank Importing Co.*, 2006 WL 3927242, at * 18 (Del. Ch. Oct. 10, 2006)).

In *Kuroda*, the Court of Chancery of Delaware dismissed an unjust enrichment claim when the plaintiff's claims were predicated on money allegedly owed pursuant to an LLC Agreement and the defendant's alleged receipt of benefits for services provided pursuant to the LLC Agreement. 971 A.2d at 891. Similarly, here, the only allegations in the unjust enrichment count that appear to have any relationship to the Cardinale Defendants are that the L3 Funds received monies from the investors and that Cardinale or businesses he owns directly or indirectly received monies from the L3 Funds. (Compl., ¶¶ 422-432.) But the L3 Manager's and Cardinale

16

Defendants' receipt of fees from the L3 Funds is undisputedly a matter of contract governed by the L3 Funds' PPMs and operating agreements. (Compl., Exs. B, pp. 8-9, 14-15, 20, 38, 61, 65-66, 71-72, 75, 121, C, pp. 8-9, 14-15, 20, 38, 61, 65-66, 71-72, 75, 120, D, pp. 12-13, 21-22, 31, 33, 57-58, 61-62, & G, pp. 10-11, 19-20, 30, 58, 60.) Just like in *Kuroda*, Plaintiffs cannot bring an unjust enrichment claim predicated on Cardinale's or his businesses' alleged receipt of fees for services provided to the L3 Funds because no quasi-contractual theory can proceed in the face of a contract that governs the parties' relationship. Accordingly, Count IX must be dismissed with respect to fees allegedly paid to Cardinale or his businesses from the L3 Funds.

Moreover, the elements of unjust enrichment confirm that Plaintiffs could only ever obtain relief from this claim derivatively. The elements of unjust enrichment are: "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law." *SpecialtyCare, Inc. v. MedCost, LLC*, No. 2025-0011-DH, 2026 WL 43202, at *13 (Del. Ch. Feb. 16, 2026). Here, the Cardinale Defendants obtained benefits from the L3 Funds, not from any of the individual investors, and therefore are not liable to any individual investor for unjust enrichment on the face of the Complaint. To whatever extent any unjust enrichment claim could proceed here, such claim could only be brought by investors derivatively.

### H.      Count XIII (Judicial Dissolution)

Plaintiffs seek to dissolve the L3 Funds. None of Plaintiffs' allegations support dissolution here. Plaintiffs rightly cite the principle that an LLC can be dissolved when its "***management*** has become so dysfunctional or its business purpose so thwarted that it is no longer practicable to operate the business such as in a voting deadlock or where the defined purpose of the entity has become impossible to fulfill." (Compl., ¶ 456 (quoting *In re Doehler Dry Ingredient Sols., LLC*, No. 2022-0354-LWW, 2022 WL 4281841, at *7 (Del. Super. Sept. 15, 2022), *aff'd* 294 A.3d 64 (Del. 2023)).) Plaintiffs' allegations about judicial dissolution are misrepresentative.

Plaintiffs highlight disputes between Cardinale and the L3 Funds' investment vehicles on the one hand, and Feingold, Dazzo, and their co-conspirators on the other hand, as evidence of managerial dysfunction, thwarted business, or voting deadlock. (Compl., ¶¶ 457-466.) But Cardinale, indirectly through the L3 Manager, is the only manager of the L3 Funds. There is no deadlock of the L3 Funds' affairs, as the L3 Manager is able to take any and all acts he believes are appropriate to support the interests of the L3 Funds, and has been doing so for years.

Further, Cardinale—through the L3 Manager acting on behalf of the L3 Funds, their investment vehicles, and himself individually—has continued to aggressively promote the L3 Funds' business interests, which include enforcing and securing the rights to the assets and interests they invested in. (*See* <u>Ex. 1</u>; Compl., ¶ 458 (detailing pending legal actions, including numerous acts by the L3 Funds, their investment vehicles, and Cardinale to support the L3 Funds and their investors' rights).) The mere fact that the L3 Funds must litigate to protect their interests because they have been defrauded by Feingold, Dazzo, and their co-conspirators does not mean that it is *not* "reasonably practicable" for the L3 Funds to "carry on the business in conformity" with their respective operating agreements. *Seokoh, Inc. v. Lard-PT, LLC*, No. 2020-0613-JRS, 2021 WL 1197593, at *8 (Del. Ch. Mar. 30, 2021) (citing 6 Del. C. § 18-802). Such a finding is usually limited to circumstances not present here, such as where "(1) the members' vote is deadlocked at the Board level; (2) the operating agreement gives no means of navigating around the deadlock; and (3) due to the financial condition of the company, there is effectively no business to operate." *Id.* (quoting *Fisk Ventures LLC v. Segal*, 2009 WL 73957, at *4 (Del. Ch. Jan. 13, 2009)).

Lastly, Plaintiffs imply that 6 Del. C. § 18-801(a)(3), which permits dissolution upon a 2/3 majority vote of the then-present members, because "[i]nvestors representing more than 2/3 of the L3 Capital Income Funds assets have requested their money back from the L3 Capital Income Fund and thus dissolution voting or consent of members threshold has ***essentially*** been met." (Compl., ¶ 465 (emphasis added).) Movants can find no support for the principle that the Court can infer from members' other actions, such as seeking redemption, as general approval from the members for a judicial dissolution, which is an entirely different legal principle. To whatever extent Plaintiffs intend to proceed under this statute, Plaintiffs have plead insufficient facts to trigger dissolution based on this allegation.

**WHEREFORE**, the L3 Funds and the Cardinale Defendants request the Court enter an order granting their motion, dismissing all claims against the Cardinale Defendants, dismissing all derivative claims brought on the L3 Funds' behalf, and granting such other and further relief as the Court deems just and proper.

Date: May 19, 2026                                    Respectfully Submitted,

                                                      /s/ Avi Benayoun
                                                      Avi Benayoun

**STUMPHAUZER KOLAYA**              **GREENBERG TRAURIG, P.A.**
**NADLER & SLOMAN, PLLC**           401 East Las Olas Blvd, Suite 2000
2 South Biscayne Boulevard, Suite 1600   Fort Lauderdale, Florida 33301
Miami, Florida 33131                T. 954.765.0500
T: (305) 614-1400; F: (305) 614-1425   Avi Benayoun
                                    Fla Bar No 0151696
/s/ Ryan K. Stumphauzer            benayouna@gtlaw.com
Ryan K. Stumphauzer                 John L. McManus
Fla. Bar No. 12176                  Fla. Bar No. 0119423
rstumphauzer@sknlaw.com            mcmanusj@gtlaw.com
Timothy A. Kolaya                   Zachary R. Needell
Fla. Bar No. 056140                 Fla Bar No 1011742
tkolaya@sknlaw.com                 zachary.needell@gtlaw.com

*Counsel for the L3 Funds*          **DWYER LAW, P.A.**
                                    201 South Biscayne Blvd, Suite 1300
                                    Miami, Florida 33131
                                    T. 305.704.7225
                                    Jared E. Dwyer
                                    Fla Bar No 104082
                                    jdwyer@jdwyerlaw.com

                                    **GREENBERG TRAURIG, LLP**
                                    One Vanderbilt Avenue
                                    New York, New York 10017
                                    T. 212.801.9200
                                    Toby S. Soli
                                    (admitted *pro hac vice*)
                                    solit@gtlaw.com

                                    *Counsel for the Cardinale Defendants*

<u>**CERTIFICATE OF SERVICE**</u>

       **I HEREBY CERTIFY** that on May 19, 2026, I filed the foregoing with the Clerk of Court

by using the CM/ECF system which will send an electronic copy to all counsel of record.

                                                      /s/ Avi Benayoun
                                                      Avi Benayoun

19